10L 461
1pi 306

## THE STATE INSURANCE COMPANY OF NASHVILLE v. DAVID HUGHES.

1. INSURANCE. *Application. Fraud.* If the assured, in his application, is guilty of willful and .intentional fraud, in regard to a material matter, he will forfeit his right of recovery against the company, but such fraud must be affirmatively proved by the insurer.

2. SAME. *Rule of construction.* The rule for the construction of contracts for insurance is, that having indemnity for their object, they will be liberally construed to that end.

3. SAME. *Articles prohibited in policy.* The use of articles prohibited in policy of insurance means habitual use.

4. SAME. *Accidental keeping of prohibited articles.* In a policy of insurance the assured was permitted " the privilege to keep seventy-five pounds of gunpowder for sale." *Held,* the mere casual or accidental presence at the store of the assured of more than seveny-five pounds of gunpowder, is not such a keeping of powder as would avoid the policy.

4. SUPREME COURT PRACTICE. *Finding of facts by judge. Same effect as a verdict by jury.* The finding of facts by a circuit judge has the same force and effect as a verdict by a jury, and where there is evidence to support it, the finding will not be disturbed by the Supreme Court.

---

FROM DAVIDSON.

---

Appeal in error from the Circuit Court of David-son county. FRANK T. REID, J.

J. C. BRADFORD and DEMOSS & MALONE for In-surance Company.

EAST & FOGG for Hughes.

GARNER, Sp. J., delivered the opinion of the court.

We have had the aid of three oral and five written arguments in this case, and have examined the record. We deem it not improper to say that vigilance, earnestness and diligence, on the part of counsel, are highly commendable.

On the 4th of December, 1877, the State Insurance Company of Nashville, in consideration of the premium, insured David Hughes against loss or damage by fire, to the amount of $9,000 on a stock of hardware, cutlery, etc., in a certain store-house on Broad Street, Nashville.

Early on the morning of Sunday, December 16,

1877, a fire occurred at the store which destroyed a portion of said goods, and damaged the balance.

Hughes and the Company not agreeing on an adjustment of the matter, he brought his suit for damages in the Davidson Circuit Court. It was tried May 14, 1879, by the circuit judge without a jury. He found for the plaintiff, and assessed his damages, with interest thereon to date, at the sum of $2,901.26.

The Company failing to get a new trial, appeals. A reversal of the judgment is insisted upon for several reasons:

First, It is insisted that Hughes committed a gross fraud on the Company by insuring his stock of goods in a sum largely in excess of their value. And that, having thus fraudulently procured such insurance; he, either in person, or by some one of his procuring, set fire to the store, and thus caused the damage and loss, to recover payment for which, he now sues.

The proof is conflicting as to the value of the goods at the time the policy of insurance was taken out.

The witness, D. W. Paschall, puts it at $3,500 in July, 1877, five months before the fire.

Arthur Breast and R. F. Adams were hardware merchants. They took an account of the stock after the fire, commencing December 18, 1877, and ending December 29, 1877. Their itemized report, of eighty pages, is in the record. They place the aggregate value of what was left on hand at $6,747.13, and assess the damage on said goods at 40 per cent of said assessment, being $2,698.85. In said report they state that they used all diligence to arrive at the cost value

of the goods on the day before the fire, and they believe it to be as nearly correct as could possibly be arrived at; and they also believe the amount of damages assessed, viz, 40 per cent, to be an equitable statement of them. They further state that what was destroyed and lost, they have not undertaken to determine, but found evidence in the *debris*, of goods having existed, that they were unable to invoice—not knowing how many of any article existed previous to the fire—but, on which, they think Mr. Hughes ought to be paid. Said statement was sworn to by these gentlemen, before Jno. H. Baskett, Esq., January 9, 1878.

Breast testifies, on the trial, that he and Adams were called on by Hughes to take an inventory of said stock, and to appraise the loss, and that the result of their labors is put down in the book shown to the court, and which is copied into the record. He further testifies, that said valuation was fairly and honestly made.

Adams testifies that he acted with Breast in the estimation of the loss occasioned by the fire; that he estimates the loss the same as Breast, and refers to the same book.

On cross examination, Adams says he t[...] $4,000 would have covered the value of the stock December 4, 1879; that he never took an inventory of Hughes' stock, and particularly examined it (we presume he means previous to the fire); and he estimates it only by seeing it in the store while in there.

Adams also states that he would not have given

$6,500 for the goods, and yet he thinks the stock was worth about 90 per cent of valuation before the fire (which, it will be observed, amounts to $6,072), and 25 per cent afterwards (which would make the sum of $1,683.78). The manifest incongruity of these statements may have arisen from the fact that figures and not words are used in the record, and it may be, that as to some of these amounts, this witness is, through inadvertence, erroneously reported, in copying his proof in the transcript.

Isaac N. Locke, Hughes' book-keeper, testifies that they took stock September 21, 1876, and its value was $16,252.72. That they next took stock July 1, 1877, that the books showing the amount are burned, but its value then, according to his recollection, was about $13,000; and he thinks the stock on hand at time of the fire was of about the same value. He further states, that their daily sales amounted to about $35 or $40. He also proves that their purchases from September 21, 1876, to July 1, 1877, amounted to $13,387.46, and their total sales during said period to $10,369.82.

Hughes' testimony on this point is to the effect that his goods at the time of the insurance, and of the fire, were worth as much as $9,000.

We ca not say, from the proof, that there was on the part of Hughes a wilful and intentional fraud, in materially overestimating the value of the goods at the time of the insurance. Nor can we say that, in point of fact, there was any over estimate in said transaction. The proof, on this point is conflicting, as we

have seen, and the weight of the proof seems to be in Hughes' favor. And had the matter been submitted to a jury, upon a proper charge, we should be disinclined to disturb their finding, from the proof in the record, in view of the settled rule adopted by this court in such cases.

As to Hughes' complicity in the fire, we deem it proper only to say, that the fire was evidently the work of an incendiary. There are indications that robbery was an object had in view by the perpetrator.. There is a mystery about the affair, which this record does not fully explain. But we cannot say that the proof implicates Hughes in this grave crime. Of course, if his goods were worth the sum at which they were insured, it is difficult to conceive of any adequate motive which could prompt him to burn them, even were he capable of committing such a crime.

Second, It is next insisted, that the policy is forfeited because Hughes kept over seventy-five pounds of powder in the store. In the insurance policy it was provided, that it should be void "if the assured shall keep gunpowder." But, as the proof shows that all hardware men keep gunpowder, this provision was modified by adding this clause, "privilege to keep seventy-five pounds of gunpowder for sale." It is insisted that Hughes kept over seventy-five pounds of powder, also that he kept over seventy five pounds of gunpowder, and that at the time of the fire, he had said excess on hand. And, in this connection, it is insisted that gunpower includes blasting-powder.

The witness, James McLaughlin, testifies that he deals in powder, and that blasting-powder is a species of gunpowder; that the difference between the two is that blasting-power is coarser grained, that they are made of the same materials. He states, however, that he never manufactured powder or saw it made. He happened to exhibit a price-current in support of his opinion, which price-current classes blasting-powder as distinct from gunpowder.

Hon. Samuel Watson testifies, that he had been raised about a powder mill, that gunpowder is composed of saltpetre, sulphur and charcoal, and blasting-powder of sulphur, charcoal and nitrate of soda; that blasting-powder is the slowest of ignition; that there is a difference between gunpowder and blasting-powder; that there is a difference in the glazing put upon them—in the rolling of them—in the size of the grains as well as the ingredients of which they are composed.

Breast, a hardware merchant, also testifies, that commercially speaking, there is a distinction between blasting-powder and gunpowder.

The relevancy of this proof is seen in the fact that a portion of the powder at Hughes' store was blasting-powder.

The proof is conflicting as to whether, at the time of the fire, there was at Hughes' store a little more, or a little less, than seventy-five pounds of gunpowder.

Hughes and Andrew Walker, the driver of the powder wagon, by their testimony show that it was a mere accident that the quantity of powder as shown, was at the store at the time of the fire. They show

that its presence then at the store, was altogether unintentional—that the driver forgot to call for it and take it out to the magazine that evening, as was his uniform custom. Perhaps the word "gunpowder" as used in this policy, should be regarded as a generic term, including also blasting-powder, both being highly explosive. But it is not necessary to determine that point, as we hold that the mere casual, or accidental presence at Hughes' store, of' an excess of powder above the quantity, specified—seventy-five pounds—was not such a keeping of powder as would avoid the policy.

Third. It is insisted, for the Insurance Company, that the policy is void because, under the Code of Tennessee, no one is permitted to keep over fifty pounds of gunpowder on hand, at any one time, within the limits of any incorporated city or town. And, in this connection, it is proper to state, that amid the many stipulations contained in the policy, we find a proviso against "deviation from municipal ordinances, or police regulations where such exist." But, then, under the policy, Hughes does not *agree to keep* any amount of gunpowder. He is only *permitted* to keep a certain amount. Besides, chapter 4, of Article 9, of Title 12, of the Code, treating of "Police Regulations" in general, and "of the storage of gunpowder" in particular, provides (sec. 1694), that "no person shall, within the limits of any incorporated city or town, *keep on hand,* at any one time, either *for sale,* or for *his own use,* more than fifty pounds of gunpowder."

By sec. 1695, a violation of this section "is declared a misdemeanor, punishable by a fine of not less than $100, and the violator is liable in damages, to any person injured in person or property thereby." And by sec. 1696, "the corporate authorities of the city or town, are authorized to designate some suitable place, at a safe distance from the corporate limits, for a magazine for the storage and safe keeping of gunpowder." And by sec. 1697, said authorities "may prescribe such regulations as to the construction of said magazines, and the storing of explosive materials therein, as will best secure the community from danger."

We cannot say, from the proof, that Hughes violated these provisions of the Code.

In Mr. May's excellent Treatise on Insurance, sec. 241, we find that use, for any purpose prohibited, means *habitual* use. Various cases are there cited, in support and in illustration of this principle.

The rule, as to the construction of contracts for insurance, is stated in May on Insurance, sec. 174, to be, that, as they have indemnity for their object, they will be construed liberally to that end.

In *Catron* v. *The Tennessee Insurance Company, et al.*, 6 Hum., 176, the eminent Judge Turley delivering the opinion of the court, holds that a slight overestimate, such as a man might honestly make in the valuation of his property, would not vitiate a policy of insurance; yet an overestimate, such as shocks the sense, and shows that it could only have been made by design, as an overestimate of one-third, would avoid the policy.

In *Phœnix Insurance Company* v. *Munday*, 5 Cold., 547, it is held that if the assured is guilty of willful and intentional fraud, in regard to a material matter, in the application for insurance, he will forfeit his right to a recovery against the Company. But such fraud must be proved affirmatively by the insurer.

It is well settled, by this court, that the finding of the facts, by a circuit judge, has the force and effect of the verdict of a jury, rendered upon a proper charge by the court. And where there is evidence to support the finding, it will not be disturbed by this court.

In view of this established rule, and applying the principles of law cited, to the proof in this record, we find no error in the judgment of his Honor, the circuit judge, and it will be affirmed with costs.